MILDRED A. BAILEY,
Plaintiff,

*vs.*

THE SUSSEX TRUST COMPANY, a corporation of the State of Delaware, both as executor under the last will and testament of William E. Walsh, deceased, and in its corporate capacity, and WILLIAM E. WALSH, JR.,
Defendants.

*New Castle, January 23, 1963.*

*James H. Conaway, Jr.,* of Morford, Young & Conaway, Wilmington, for plaintiff.

*Robert W. Tunnell,* of Tunnell & Raysor, Georgetown, for defendant Sussex Trust Co.

*James M. Tunnell, Jr.,* of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendant William E. Walsh, Jr.

MARVEL, Vice Chancellor: Plaintiff's complaint herein contains two causes of action, the first of which sets forth as its principal contention that Sussex Trust Company and the defendant William E. Walsh, Jr., plaintiff's brother, improperly brought about the creation of three demand bank accounts at the Sussex Trust Company in the name of William E. Walsh and that of his son, William E. Walsh, Jr., which contrary to the father's intent, purported to create joint accounts made up entirely of decedent's moneys with a " * * * right of survivorship as between the said William E. Walsh and his son, the defendant William E. Walsh, Jr. * * * "  Such first cause of action, which is derivative in form, was allegedly brought by plaintiff on behalf of the estate of William E. Walsh because the defendant Sussex Trust Company, executor of such estate, had refused to remedy the wrongs complained of.  However, it having become apparent in the course of discovery that plaintiff could not successfully establish that defendants had improperly procured the late Mr. Walsh's signature to the account cards in question, plaintiff's theory of recovery is now that the actual purpose and intent behind the creation of the deposit arrangement under attack may be established by

parol evidence. Plaintiff claims that evidence of this type (which was admitted at trial subject to a motion to strike) furnishes a solid basis for a finding that the moneys on deposit in such accounts on William E. Walsh's death were actually his and should be treated as such. Plaintiff and her brother, William E. Walsh, Jr., are decedent's only children, and, except for a bequest in trust of $100 to the Bethel Methodist Church of Lewes, the beneficiaries in equal shares of his estate under the terms of his last will and testament.

The first cause of action goes on to allege that no intent having been shown on the part of the father to make a present or future gift to his son of the moneys placed in such accounts, upon the death of William E. Walsh said moneys became an asset of his estate, which, under the terms of his will, should have been divided equally between his two children after discharge of decedent's debts, payment of the expenses of settling his estate and the placing in trust of the small charitable bequest referred to above. Such being the case, according to plaintiff, Sussex Trust Company breached its duty to administer such assets as executor, having " * * * knowingly permitted the withdrawal and conversion of said funds by the defendant William E. Walsh, Jr." It is accordingly submitted that because of such unauthorized action and other acts of partiality towards the son, resulting in a claim for surcharge and exposure to other charges of alleged breach of trust, including the unauthorized practice of law, such fiduciary should be removed as executor of the Walsh estate.

In a second cause of action, plaintiff repeats the allegations of her first cause of action and seeks a declaratory judgment to the effect that the sum of $53,781.39 on deposit in the accounts in question at the time of the death of William E. Walsh was in fact part of such decedent's estate and so recoverable in the name of the estate. The complaint concludes with appropriate prayers for relief, including an accounting by both defendants, a surcharging of the bank, if necessary, and the removal of Sussex Trust Company as executor.

All three of the accounts here in issue were in existence long prior to the time the joint signature cards in evidence were executed by Mr. Walsh and his son, the card for the special account, which had been a joint account in the names of William E. Walsh and his

wife until her death in 1956 having been executed about ten years after the signing of the other two cards. It was also established at trial that the so-called regular account as well as the building account were carried in Mr. Walsh's name alone prior to the time William E. Walsh, Jr. and his father signed [1] the signature cards in question. The building account came into being in 1928, while the regular account existed as early as 1919. Both accounts were presumably converted into joint accounts [2] at the same time, which, from the available records, must have been sometime between July 15, 1946 and April 18, 1947. The ledger cards of the bank indicate that the actual date of conversion was November 14, 1946. The third account, namely the so-called special account, however, was not created until October 11, 1947. The original signature card in that account was executed by both Mr. and Mrs. William E. Walsh, the account bearing, as noted above, the title "William E. Walsh or Nora May Walsh Special". Several weeks after Mrs. Walsh's death in 1956 Mr. Walsh and his son signed a new signature card with respect to this account; however, the reinstated account was merely entitled "Special Account".

Plaintiff contends that in signing these joint signature cards with the defendant William E. Walsh, Jr., their father merely intended to confer upon his son the powers of an agent so that such defendant might draw checks on such accounts as an accommodation to his father, and there is no doubt but that because of illness and other factors the decedent had in the past informally used the services of his son and others for just such a purpose. In fact, the desire of the bank to eliminate the loose practice of having others draw checks on William E. Walsh's funds with his informal consent was a factor leading up to the execution of the controversial joint account cards here in issue. She therefore contends that in determining her father's actual intent as of the time the cards were executed, the Court may look beyond the writing appearing on the cards themselves. The son

1. When the joint accounts were formed with the son, the regular account was entitled "Wm. E. Walsh" and the building account, "Wm. E. Walsh Building Account".

2. Unlike the cards in *In re Furjanick's Estate, infra,* and *In re Amour,* 397 *Pa.* 262, 154 *A.2d* 502, none of the account cards here in issue is set up in the disjunctive, although the original special account with Nora May Walsh was.

contends, on the other hand, that the signature cards constituted a contract in writing under seal between himself and his father and between each of them and the bank, which contract embodies the entire undertaking of the parties and constitutes an agreement which cannot be varied by parol evidence. In the alternative, he argues that in any event the evidence·supports a finding that his father clearly made a gift to him of moneys in the accounts.

The language purportedly constituting the entire contract of the parties appears on the reverse side of each of the signature cards, below which appear the signatures of Mr. Walsh and his son. The language on each of the cards appears to be identical and reads as follows on the so-called special account card:

"Joint Account-Payable to Either or Survivor

"It is agreed and understood that any and all sums that may from time to time stand on this account, to the credit of the undersigned depositors, shall be taken and deemed to belong to them as joint tenants and not as tenants in common; while both joint tenants are living, either may draw and in case of the death of either, this Bank is hereby authorized and directed to deal with the survivor as sole and absolute owner thereof.

"It is especially agreed that withdrawals of funds by the survivor shall be binding upon us and upon our heirs, next of kin, legatees, assigns and personal representatives.

"Payment to or on check of the survivor shall be subject to the laws relating to inheritance and succession taxes and all rules and regulations made pursuant thereto.

"Witness our hands and seals this ―― day of ―――― 19―."

The precise issue presented with respect to the bank accounts in issue is whether the language appearing on the signature cards may be construed to constitute binding contracts between Mr. Walsh and his son concerning title to the funds in question, and, if so, whether the written terms thereon contained may be varied by parol evidence. The son contends that the language on the cards is neither incomplete nor equivocal and that under the rule stated in *Re Fur-*

*janick's Estate*,[3] 375 *Pa.* 484, 100 *A.2d* 85, Mr. Walsh's intent must be gathered from the cards alone without resort to extrinsic evidence. Plaintiff, on the other hand, argues that the cards are not strictly speaking contracts between Mr. Walsh and his son but are actually devices designed to protect the bank in its commercial capacity. In any event, she contends that parol evidence is admissible to prove that neither her father nor her brother intended the creation of what on their face might appear to have been binding agreements between themselves for the purpose of consummating the gifts to the son.

First of all, it must be noted that these controversial cards are standard forms prepared by the bank for its own purposes, the language on the cards containing terms which serve the basic purpose of protecting the bank in its handling of joint account funds. And while this form of contract purports to be a joint undertaking by the two signers that neither will contest as against the bank the propriety of a withdrawal by the other, the language used does not speak in absolutes as between the so-called depositors. Thus, as noted above, it is stated that the sums to be deposited " * * * shall be taken and deemed to belong to them as joint tenants * * * ", and the bank is " * * * authorized and directed to deal with the survivor as sole and absolute owner thereof * * *." In short, the language contained on the cards does not specifically state that by signing such cards the signers actually become joint tenants, or that the survivor shall be the sole owner of the balance, if any, then in the accounts. On the contrary, the language used merely authorizes withdrawals by either party or the survivor as if the signatories were actually joint tenants and provides further by special agreement that the heirs of either shall be bound with respect to such withdrawals. Again,

3. In contrast to the inexact phrases on the cards here in issue such as that sums in the account " * * * shall be taken and deemed to belong to them as joint tenant * * *" and that " * * * withdrawals of funds by the survivor shall be binding upon us * * *" the joint card in the *Furjanick* case provided that the depositor " * * * agree each with the other * * *" that deposits " * * * are and shall be owned by them jointly, with the right of survivorship * * *" and that " * * * upon the death of either the balance in said account shall belong to the survivor of them * * *." Finally, the *Furjanick* agreement was made irrevocable except by written consent of both depositors, and the card read "Pit Furganic or Sue Furganic Joint Savings Account".

the latter language appears to be designed primarily to protect the interests of the bank.

That the language contained on the cards here used carries no more than the force and effect attributed to it by plaintiff, is, I think, supported by a consideration of the transaction both from the point of view of the bank and that of the actual depositor. Decedent had been a director of the corporate defendant for many years and was faithful in attending meetings of directors until his 1955 illness. This close contact between the bank and decedent as well as his reputation as a successful local businessman did not pass unnoticed by employees of the bank, resulting in a ready acceptance of decedent's instructions as to the handling of his funds so long as the bank's interests were protected. Thus, no effort was apparently made to discuss decedent's precise needs and desires and how best to meet them. And, as noted above, in this type of account, a bank need not necessarily concern itself with the question of ownership of the funds on deposit so long as it is fully protected with respect to withdrawals. Significantly, Mr. Morris, the bank officer most closely associated with the creation of the joint accounts, could remember [4] little or nothing about the transactions in dispute except that he had properly declined to act for Mr. Walsh in the signing of checks prior to the opening of the first two accounts.

Being of the opinion that the language on the cards here in evidence is sufficiently uncertain as to who was to be the actual holder of legal title to the funds on deposit, I have determined that parol evidence may be used to ascertain intent. In other words, to construe the language of the agreements here in issue as forming immutable undertakings between the actual depositer and the other signer not subject to interpretation by parol evidence, is, I think, to read more into the deposit cards than actually exists. Finally, I do not think that the fact that a custom exists in Sussex County of employing joint accounts as a testamentary device changes the conclusion which I have reached.

---

4. He did recall, however, that in 1946, prior to the execution of the cards for the first two accounts, when Mr. Walsh was seriously ill after an operation, he was " * * * very specific in not wanting one child to have more than the other." T. p. 423.

■■ Turning to the facts and circumstances surrounding the transaction, there is first of all no evidence that any consideration was to pass or did pass from the son to the father at the time of the creation of the accounts, nor is there any evidence that the son intended to make or did make deposits of his own moneys in the accounts. And while counsel for the son contends that the presence of two printed seals on the lines where he and his father signed the cards obviates the need for actual consideration, such technical consideration may not, in my opinion, control title to funds in a present-day financial transaction of this type in the absence of other proof of actual intention to make a gift or otherwise to contract, at least where the language used in setting up the account does not of itself effect a transfer of title to funds as was the case in *Re Furjanick's Estate supra*. The funds in dispute clearly belonged to Mr. Walsh before they were deposited. If he intended to any extent to make a present gift of them, that fact should be made affirmatively to appear. If a gift was not intended, then neither he nor his estate should be bound to accept the son's contentions, *Rauhut v. Reinhart*, 22 *Del.Ch.* 431, 180 *A.* 913.[5] To the extent that the decision in *In re Amour, supra*, extends the *Furjanick* ruling and bars parol evidence to explain the purpose behind a joint account established on a card similar to the ones used here, I decline to follow[6] it.

I conclude that the evidence here of record supports a finding that William E. Walsh did not intend to divest himself of full owner-

5. In this case, in which the Court considered "both oral and written" evidence in determining intent, one deposit card provided: "We * * * do hereby agree with the WILMINGTON SAVINGS FUND SOCIETY that the moneys deposited by us, or either of us, to this account, is for the joint and several use of us both; is to be drawn upon by each or either of us and any balance remaining unpaid at the death of either of us, shall belong to the survivor, and the said Society shall be under no liability or responsibility for any such payment to us, or either of us, jointly or severally * * *." The second card read "We * * * do hereby agree with the Artisans' Savings Bank that the monies deposited by us, or either of us, to this account, is for the joint and several use of us both; is to be drawn upon by each or either of us and any balance at the death of either of us shall belong to the survivor."

6. But see *In re Rogan's Estate*, 404 *Pa.* 205, 171 *A.2d* 177, in which parol evidence was admitted where the deposit card provided inter alia that deposits "* * * are and shall be owned by them jointly".

ship of the moneys in these bank accounts when he signed the several cards which created joint accounts with his son. Indeed, the son himself offered no convincing reason why his father should have so bound himself by contract or have otherwise made a gift to him through the device of joint accounts. He testified that in 1946, when the first two cards were signed, he was merely called from his father's store to the bank and asked to sign. During the ten or more years that these two accounts were in existence the son never made any use of the funds contained therein for his own benefit except with his father's consent. When checks were drawn by him for his father's benefit, the son signed them "William E. Walsh per William E. Walsh, Jr." The checks themselves carried the printed heading "William E. Walsh, Lewes, Delaware." The deposit slips used in the accounts were made out in Mr. Walsh's name alone except when the special account was carried in his wife's name as well as his. And while the bank's ledger cards for the accounts in dispute did carry the typewritten names of both the father and son, this was a reasonable arrangement under the circumstances in view of the large number of checks signed by the son for his father. There were many times during the existence of the accounts when the son had need of funds other than those undoubtedly his own and his reason for not personally drawing on the accounts, namely that he feared that his father would need the money, is not convincing in view of the father's other substantial property. While the card for the special account was executed ten years later, after the death of Mr. Walsh's wife, it is not contended by either side that such account stands on a different footing than the first two. Significantly, the son had executed checks against this account on his father's instructions at least a year before the joint account card was signed.

Neither party introduced any clear and convincing evidence of the actual purpose in Mr. Walsh's mind at the time any of the accounts here in issue were set up. However, viewed in its entirety the record lends little support (other than the purported effect of the signature cards themselves) to the contention that Mr. Walsh intended by gift or by contract to vest in his son a present interest in the funds in question. Actually, if the regular account as well as the building account had been the subject of effective gifts to the son in 1946,

Mr. Walsh's wife, the primary beneficiary under his then will, would have been denied a substantial interest in his estate had the testator predeceased her.

The son, in support of his contentions, introduced evidence to the effect that his father was disposed to favor him over his sister and that a valid reason therefore existed for a gift to him of the funds in the accounts. However, I think the fact is that Mr. Walsh was not happy about the existing antagonism between his son and daughter and had no desire to aggravate it by allotting them grossly disproportionate shares of his property. In short, I am of the opinion that the record fairly supports the conclusion that Mr. Walsh intended that on his death virtually all of his property should be equally divided between his children and that he did not wish to favor one against the other. Accordingly, I find that Mr. Walsh did not intend to make a present gift of moneys to his son and that on the father's death plaintiff should have received from the bank as executor the net of her one-half interest in the bank accounts here in dispute.

Plaintiff next contends that the bank failed in its duties as executor in that it allegedly favored her brother and thereby deprived plaintiff in other respects of her full share in other property belonging to her father's estate. Thus, the bank is charged with the unlawful practice of law, presumably with respect to assistance rendered to Mr. Walsh without the advice of counsel in the preparation of his will. She also claims that the bank acted negligently in relying on the advice of her brother or that of his attorney in making a determination as to whether certain property claimed by the son actually belonged to Mr. Walsh at the time of his death. Included among these contested assets are the so-called inventories of certain businesses with which Mr. Walsh and his son were formerly associated as well as the funds contained in the three bank accounts referred to above.

With respect to the items (other than the bank accounts which the bank allowed the son to withdraw) plaintiff claims that if the bank had exercised due diligence it could have ascertained that such items were actually owned by her father. Admittedly, in collecting the assets of Mr. Walsh's estate the bank did rely to a con-

siderable degree on the son's statements with respect to ownership but in view of the close relationship between personnel of the bank and Mr. Walsh, the size of Lewes, a small community where much is generally known about other people's business affairs, and the fact that plaintiff was not a resident and not particularly knowledgeable about her father's businesses, I do not believe that such reliance was unreasonable or misplaced at least in the absence of any indication that the son's information or other sources of information which the bank looked into were to any extent false. I find that the evidence in this regard falls far short of making out a case of collusive partiality on the part of the bank towards the interests of decedent's son. In other words, the bank, as executor, was called upon to make decisions as to the ownership of certain property with which both the father and son had dealt. Apart from the bank accounts, this property consisted for the most part of the assets of two local businesses, one having to do with oil heating and the other with outboard motors. The son maintained that these businesses were his, that he had personally run them for a number of years prior to his father's last illness and death and that their assets belonged to him. Mr. Walsh was virtually in retirement because of illness during the last few years of his life. The bank, upon investigation, found nothing to contradict these assertions. During his lifetime Mr. Walsh operated a number of businesses in Lewes, in some of which he had employed his son at low wages. However, in his declining years he had sought, without notable success, to back his son's efforts to establish himself as an independent businessman. Thus, it is hardly surprising that on Mr. Walsh's death there was doubt as to the ownership of certain business assets with which his son was concerned. The conclusion of the bank, reached in the absence of any substantial indications to the contrary, was that the property about which plaintiff has raised questions belonged to the son. I conclude that plaintiff, having had full opportunity by discovery and otherwise to press her derivative claim with respect to these items, failed to establish that the business assets here in issue were in fact the property of her father. With respect to a claim to moneys which the son purportedly found in his father's possession and refused to turn over to the bank I find no evidence to support such contention other than plaintiff's assertions. I decline to accept her contention.

Finally, I turn to plaintiff's claims that the bank should be surcharged for the balance due her from the three bank accounts as of the date of Mr. Walsh's death and also summarily removed as executor. Plaintiff argues that the bank as executor had a duty to retain these funds for the estate notwithstanding the statement on the signature cards that the money was payable to the survivor. The bank, on the other hand, contends that it relied on the signature cards as well as the advice of counsel and the provisions of *Title* 5 *Del.C.* § 923 [7] in paying out these funds to the son. As I have indicated earlier in this opinion, I believe that the signature cards here in issue extended protection to the bank in its commercial capacity and not in its capacity as executor. Furthermore, the section of the Delaware Code quoted in footnote 7 is permissive in nature and it does not, of course, affect the fiduciary duties of an executor.

In view of the initial acquiescence of plaintiff's then counsel and past practice, the bank acted justifiably in permitting the preliminary withdrawals of moneys by the son. However, after the bank learned of plaintiff's renewed claim to a share of such moneys it should have, in my opinion, declined to permit further withdrawals, at least to the extent of safeguarding plaintiff's claimed interest in her father's estate, and in the meantime have sought a court determination of the problem presented. Accordingly, judgment will be entered in favor of plaintiff and against her brother and the bank in its capacity as executor for plaintiff's proportionate testamentary share of her father's estate.

Assuming but not deciding that this Court has jurisdiction to remove an executor for alleged breaches of fiduciary duty, the only substantial charge established, namely acquiescence in the withdrawal of the so-called joint account funds by the son, does not under the circumstances presented warrant the corporate defendant's

---

7. § 923 "Deposits in names of two or more persons. When a deposit in any bank, trust company, savings bank or other banking institution in this State, is made in the name of two or more persons, deliverable or payable to either, or to their survivor or survivors, the deposit, or any part thereof, or the increase thereof, may be delivered or paid to either of the persons, or to the survivor or survivors, in due course of business."

removal as executor. The commissions paid the bank in its capacity as executor will not be disturbed.

On notice, an appropriate order may be submitted.