398 A.2d 1210 (1978)
In the Matter of the Probate of the Last Will and Testament of Paul R. McCALL, Deceased.
Court of Chancery of Delaware, New Castle County.
Submitted November 14, 1978.
Decided December 8, 1978.
John Merwin Bader, of Bader, Dorsey & Kreshtool, Wilmington, for exceptants.
James F. Harker of Herlihy & Herlihy, Wilmington, for the administratrix c. t. a.
MARVEL, Chancellor:
This action is concerned with exceptions to the inventory and final account filed in connection with the proposed settlement of the estate of the late Paul R. McCall, two of the decedent's three children contending that a Bank of Delaware checking account in the name of the decedent is what it purports to be, namely an individual account and should be included as an asset of the decedent's estate.
The following facts appear to be undisputed, namely that the decedent, Paul R. McCall, owned and operated a gasoline service station located at the intersection of Faukland and Center Roads in New Castle County. The business was organized as a sole proprietorship carried on under the name of Faukland Esso, a name, which, for obvious reasons, was later changed to Faukland Exxon. In connection with the operation of such business Mr. McCall during 1967 opened a checking account at Bank of Delaware under the name Faukland Esso, later changed to Faukland Exxon.
At all times here pertinent Bank of Delaware followed its customary practice of using a simple printed form for setting up of an account for use by a proprietorship[1] on which blank spaces are provided in which to fill in data as to the name of the account to be set up, the name of its owner, the account number, and a direction to the bank as to whom it may recognize as the authorized signer or signers of checks to be drawn on such account.
Normally a signature card accompanies such form on which signatures of those *1211 authorized to sign checks are inscribed. There was no express contract or agreement printed on the cards here in issue but there was a printed legend on them directing the bank to recognize the names thereon to be authorized signatures on checks drawn on such account.
In November of 1967, Mr. McCall caused to be filed with the bank another form indicating that both he and his then wife, Rayma, had an interest in the account and that either could sign checks on said account. In September of 1968, however, he filed yet another form with the Bank of Delaware, similar in form to the first, designating himself as sole owner and also as the sole authorized signer of checks on said account. In March of 1970, he submitted still another form, again similar to the first two, designating himself as the sole owner but providing that either he or his then wife, Rayma, could sign checks drawn on said account. Finally, in November of 1973 he filed the form which remained in force and effect at the time of his death designating himself sole owner of such account but containing provisions authorizing either himself or his then wife and now widow, Jean, to sign checks[2] on such account.
At the time of Mr. McCall's death in February of 1977 the Faukland Exxon account had a balance in it of just under $60,000.[3] The present Mrs. McCall and Mr. McCall had been married on August of 1973, and her name had been added as a signatory to the account on the bank's records by November 1973.[4] Exhibit No. 6 reads as follows:

[See following illustration on p. 1212]
*1212 
Mrs. McCall testified that both she and her deceased husband had little formal education. She further testified that at the time when exceptants' exhibits Nos. 6 and 7 were executed, it was her intention and that of her deceased husband, Paul R. McCall, to create a joint account with right of survivorship. She testified specifically that they had informed the bank that it was to be a joint account and to be put in both names. In the words of Mrs. McCall, "* * * if Paul died, it would all be mine and if I died, his."[5] Mrs. McCall also noted that prior to executing these documents she *1213 had deposited in the Faukland account her life's cash accumulations consisting of approximately $5,000.56.[6] Other deposits made by her into the Exxon account were allegedly as follows: $8,000 realized from the sale of furniture and other miscellaneous items which had been acquired during a prior marriage, $1,500 from the sale of an automobile, $4,900 from a joint investor's account held in the name of Paul and Jean McCall, $35 a week received by her in the form of child support from her former husband from the time she married Mr. McCall, August 13, 1973 until the death of her former husband in 1976, and $100 a month rental from an apartment she owned as a tenant in common with her former husband.[7] Mrs. McCall further testified that in addition to the deposits referred to above, the funds in the Faukland Exxon account were used for business, personal and household purposes.[8]
Mrs. McCall also emphasized that the parties had no other bank account of either a checking or savings nature, and shortly after the execution of exceptants' exhibit No. 6, Mrs. McCall received her own small Faukland Exxon checkbook. She testified at trial that she drew checks for any purpose on the alleged joint account, using both her own checkbook and the larger business checkbook. Finally, Mrs. McCall stated at trial that she had worked at the service station at her husband's side without pay since their marriage in August of 1973[9] until his death.
The basic issue now before the Court is whether or not Mrs. McCall's testimony should be considered in construing the legal effect of exhibit 6, or stated in another way, should parol evidence have been admitted to explain or vary the writing in issue?
The exceptants place great emphasis on the case of Walsh v. Bailey, Del.Supr., 41 Del.Ch. 420, 197 A.2d 331 (1964).[10] Presented with a set of facts quite similar to those presently before this Court, that Court in overruling the Court below, decided in answer to appellees' argument that parol evidence should have been properly admitted by the trial court to show mutual mistake that:
"A court of Equity may, of course, grant appropriate relief when mutual mistake is properly proven, but to prove it the evidence must be clear and convincing; mere preponderance does not suffice."
Exceptants' argument is that even if Mrs. McCall's testimony is taken at face value, there is still no evidence (let alone clear and convincing evidence) that Mr. McCall or the bank mistakenly used the wrong form and that therefore this Court may not grant her relief in the form of reformation.[11]
*1214 Exceptants further note that the Delaware courts will not find a joint tenancy to exist in the absence of clear and convincing evidence to intent to such effect, Bothe v. Dennie, Del.Super., 324 A.2d 784 (1974), Howard v. Farmers Bank of the State of Delaware, Del.Supr., 268 A.2d 870 (1970), and Short v. Milby, Del.Ch., 31 Del.Ch. 49, 64 A.2d 36 (1949).[12] The following rules are stated at page 788 of Bothe, supra:
"In order to create a joint tenancy with survivorship, language specifically showing an intent to create such relationship must have been used. A transaction will not be given the effect of a joint tenancy with right of survivorship unless clear and definite language is used from which the conclusion is without reasonable dispute that such relationship was intended." (Citations omitted).[13]
Administratrix, Jean A. McCall, as noted above, contends that the Faukland Exxon account was in fact a joint account with right of survivorship and is therefore not to be considered an asset of the estate of her deceased husband, Paul. She concedes that on its face exhibit No. 6 does not explicitly create a joint tenancy but argues that such should not be dispositive of the question as to whether or not a joint account actually existed because ownership of a bank account is to be determined by the intent, actions and competency of the depositors, and the manner in which the bank keeps its records is not conclusive proof of ownership, Saylor v. Southern Arizona Bank and Trust Company. Arizona, Ct. of App., 8 Ariz.App. 368, 446 P.2d 474 (1968). Furthermore, decisions have recognized the fact that an estate by the entireties can exist in personal property[14] and that such an estate may be evidenced by a joint deposit in the name of husband and wife, or may be inferred from the surrounding circumstances, Oliphant v. McAmis, Tenn.Supr., 197 Tenn. 367, 273 S.W.2d 151 (1954).
Mrs. McCall agrees that Delaware courts have taken the position there where the intention of the parties is evidenced by an unambiguous written agreement, such agreement must be enforced as written, Walsh v. Bailey, Del.Supr., supra. However, where the intention of the parties is not clear on the face of a written agreement, evidence as to their intentions will be considered, Moser v. Moser, Del.Supr., 287 A.2d 398 (1972). Mrs. McCall has made the point that exhibits No. 6 and 7 are standard form documents prepared by the Bank of Delaware and are used in various circumstances for all types of accounts, and that parol evidence is therefore admissible in a situation in which both the intent and object of the writing cannot be ascertained from the language employed, or where the language is vague, uncertain, obscure or ambiguous. 32a C.J.S. Evidence § 959. In short, it is argued that the principal document here in issue being ambiguous, the true intent of the parties cannot be ascertained on an examination of the document itself.
The second ground urged for the admission of parol evidence is that of mutual mistake.[15] It is argued under this theory that as a result of mistake the bank documents in issue do not reflect the actual *1215 intent of the parties which was to create a joint account with right of survivorship.[16] The administratrix contends that there is clear and convincing evidence to the effect that the parties had agreed to establish a joint account with right of survivorship and that under such circumstances, equity should grant reformation[17] so as to have the written agreement comport with the actual intent of the parties and grant the relief sought by Mrs. McCall by holding the account was in fact intended to be a joint account. See 66 Am.Jur.2d, Reformation of Instruments, Secs. 12 and 22.
First of all, it must be noted that the cards here at issue are standard forms prepared by the bank for its own purposes, the language on the cards containing terms which serve the basic purpose of protecting the bank. Thus, a bank need not necessarily concern itself with the question of ownership of the funds on deposit so long as it is fully protected with respect to withdrawals, Bailey v. Sussex Trust Company, Del. Ch., 41 Del.Ch. 57, 187 A.2d 825, 829 (1963), the purpose of such a card being not for the purpose of establishing ownership but only to guard against a payment to an unauthorized person, Geist v. Robinson, Pa.Supr., 332 Pa. 44, 1 A.2d 153, 155 (1938).
Secondly, I am satisfied that there is clear and convincing evidence that a mutual mistake did in fact occur. Mrs. McCall testified that she and her husband's main purpose in going to the bank and signing the documents in question was to create a "joint account with right of survivorship". It was also established at trial that over recent years she had worked side by side with her husband at the gasoline service station, that both she and her husband were of limited education, that no other account, checking or savings existed in their names, that she had deposited her own monies in substantial amounts in the Exxon account, and that she had drawn checks for personal business and household purposes using her own checkbook as well as the larger business checkbook. Exceptants argue that even if the widow's testimony is accepted, there is no evidence that the intentions of either Mr. McCall or of the bank were mistakenly nullified. However, I am satisfied, in the absence of evidence contradicting Mrs. McCall's testimony as to her intent and that of her deceased husband that there is brought into play the principle set forth in the following ruling:
"Where the testimony of an interested witness is uncontradicted, is clear and positive, and there are no circumstances in evidence tending to discredit or impeach such testimony, conclusive effect may be given thereto. The applicable rule is further strengthened where . . the opposite party had the means and opportunity of disproving the testimony, if it were not true, and failed to do so." McGuire v. City of Dallas, Texas Comm. *1216 of App., 141 Tex. 170, 170 S.W.2d 722, 728 (1943).[18]
In addition I consider it significant, in arriving at a finding of an intention on the part of the decedent and of his wife that a joint account with right of survivorship was to be established at the Bank of Delaware, that such bank has continued to recognize a right on the part of Mrs. McCall, as the survivor of her husband Paul to continue to draw moneys from the Faukland Exxon account here in issue.
Furthermore, the fact that one of the parties to a contract denies that a mistake was made does not prevent a finding of mutual mistake, McFadden v. American Oil Company, Pa.Super., 215 Pa.Super. 44, 257 A.2d 283, 288 (1969).[19]
In light of the evidence before me, I discern no credible evidence which tends to discredit or even conflict with Mrs. Jean McCall's testimony concerning a mutual mistake in the setting up of the Faukland Exxon account following her marriage to Mr. McCall. I am therefore of the opinion that the basic document in issue, namely exhibit 6, must be reformed to include Mrs. McCall's name as one of the owners of the property in question, thereby creating a joint tenancy with right of survivorship as was, I believe, intended by the decedent and his surviving spouse.
On notice an order to such effect may be presented.
NOTES
[1] Mr. Shiffer of the treasurer's department of the Bank of Delaware testified that the same card was also used for corporations and partnerships. If the business is not a corporation, the titles president, vice president, etc. are crossed out.
[2] There is no record of any papers having been filed subsequent to those last mentioned, and the bank recognized the same as being in effect at the time of the decedent's death. There was, however, accompanying this last form, a signature card in the form noted above containing his signature and that of Jean McCall. Presumably through an oversight, the printed words president and vice president were not crossed out. Mr. Shiffer testified concerning the execution of exceptants' exhibit Nos. 3, 4 and 5. Exceptants' exhibit No. 3 shows that the funds in the bank account in question were the property of Paul R. McCall and Rayma F. McCall, decedent's second wife, who predeceased Mr. McCall. Exceptants' exhibit No. 4 shows that the funds were the property of only Paul R. McCall with no one designated to sign checks. Exceptants' exhibit No. 5 again shows the property belonging to Paul R. McCall with Paul and his second wife, Rayma, as signers. Handwritten notes by Bank of Delaware officials on exceptants' exhibit No. 4 show that the purpose for execution of the new agreement was change of signers. Similarly exceptants' exhibit No. 5 has a notation simply of "change".
[3] The Bank of Delaware account in question is still an open and active account. Mr. Shiffer of the bank indicated that checks drawn by Mrs. McCall on the account would still be honored despite exceptants' allegations that the funds belong exclusively to the estate of Paul R. McCall. There is presently $13,000 remaining in the account.
[4] Mrs. Rayma McCall died in December of 1972. At that time there was in effect the bank form of March 1970 indicating Mr. McCall to be the owner, and Paul R. McCall and Rayma McCall as authorized check signers.
[5] Mr. McCall's daughter, Nancy Messick, stated on direct examination that her father indicated on several occasions that he had left everything to Jean and apparently cut off "the kids." Although Beverly Littleton, one of the exceptants, stated that she could not recall whether her father stated that he had signed all of his property over to Jean, she has admitted that her father stated "he changed all but his will." Counsel for Mrs. McCall also notes that the administratrix's inventory lists the real estate of decedent, 4611 Barley Drive, furniture and family autos as jointly owned property and that no exceptions were taken as to these items.
[6] She also claims that this amount and any other deposits made in the Faukland Exxon account were not intended to be gifts to the deceased. All other monies deposited in the Exxon account were deposited after the documents in question had been executed.
[7] Deposits of child support and rent over the period allegedly stated are approximately $5,200 and $3,300 respectively. Total deposits into the account by Mrs. McCall from her own funds approach $27,900. However, none of these deposits can be documented due to the fact that there were no separate deposit slips made for these claimed deposits.
[8] These included payment of the mortgage, groceries, electric bills, doctor bills, and other miscellaneous personal items of both husband and wife.
[9] This included maintaining the company books, looking for parts, and pumping gas.
[10] See also Messersmith v. Delaware Trust Company, Del.Ch., 215 A.2d 721 (1965).
[11] Exceptants' argument is basically as follows:

"`If the Court were to reform the writing to make it accord with the intent of one party only to the agreement, who avers and proves that he signed it as it was written by mistake, when it accurately expressed the agreement as understood by the other party, the writing, when so altered, would be just as far from expressing the agreement as it was before, and the court would be engaged in the singular office of doing right to one party at the cost of a precisely equal wrong to the other.'" Greene v. Stone, N.J.Supr.Ct.Err. & App., 58 N.J.L. 695, 34 A. 1099, 1103 (1896).
[12] Exceptants also note that the authorities in other jurisdictions are in accord. Esposito v. Palovick, N.J.Super., 29 N.J.Super. 3, 101 A.2d 568 (1953) and Richards v. Richards, N.J.Ch., 141 N.J.Eq. 579, 58 A.2d 544 (1948).
[13] In short, the exceptants argue that Mrs. McCall had only the "power" to write checks on this account, which power expired at her husband's death.
[14] See also Widder v. Leeds, Del.Ch., 317 A.2d 32, 35 (1974).
[15] See 66 Am.Jur.2d Reformation of Instruments Sec. 23, where it is said that:

"A mutual mistake, for which an instrument will be reformed, is one which is reciprocal and common to both parties, each alike laboring under the same misconception in respect to the terms of the written instrument. It is a mistake shared by both parties to the instrument at the time of reducing their agreement to writing, and the mistake is mutual if the contract has been written in terms which violate the understanding of both parties  that is, if it appears that both have done what neither intended." See also Delong v. Cobb, Georgia Supr., 215 Ga. 500, 111 S.E.2d 89, 92 (1959).
[16] In support of this statement it is again noted that Paul McCall had transferred his real estate and automobile into joint names with his wife. Additionally, Beverly Littleton, one of the exceptants, testified that she remembered her father stating that he had changed everything over to his wife's name with the exception of property disposed of by his will.
[17] As stated at 76 C.J.S., Reformation of Instruments § 4, at page 329:

"Reformation is predicated on the equitable maxim that equity treats as done at which ought to be done. It presupposes that the instrument does not express the true intent of the parties, and contemplates a continuance of the contractual relations on what both parties really intended should be the stipulation. It proceeds on the theory that a valid contract was created by the negotiations of the parties, but by mistake is wanting in formal expression or execution so as to evince the actual intent of the parties. The purpose of reformation is to make an erroneous instrument express correctly the intent of, or the real agreement between, the parties, or, in other words, its purpose is not to make a new contract or an instrument, but to give effect to the original intent of the parties."
See also Miller v. Hob Tea Room, Del.Ch., 31 Del.Ch. 404, 75 A.2d 577, 580 (1950) where it is said:
"`In order for a court of equity to reform a contract in writing, it has been well said . . that the parties thereto must have previously "come to a complete mutual understanding of all the essential terms of their bargain, for otherwise there would be no standard by which the writing could be reformed".'"
[18] See also 30 Am.Jur.2d Evidence Sec. 1084, p. 236, Lotspeich v. Chance Vought Aircraft, Tex.Civ.App., 369 S.W.2d 705 (1963) and Duncanson v. Service First, Inc., Florida Dist.Ct. App., 157 So.2d 696 (1963).
[19] See also Bollinger v. Central Pa. Quarry Stripping and Constr. Co., Pa.Supr., 425 Pa. 430, 229 A.2d 741 (1967) and Kutsenkow v. Kutsenkow, Pa.Supr., 414 Pa. 610, 202 A.2d 68 (1964).